

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

ALLEN J. SQUIRE

       Plaintiff,

vs.

       Case No. 25 - cv
       Hon.

UNITED STATES OF AMERICA,

       Defendant
_____/

JOEL A. SANFIELD (P42968)
STEFFANI CHOCRON (P45335)
LIPTON LAW
Attorneys for Plaintiff
18930 W. Ten Mile Road
Southfield, Michigan 48075
(248) 557-1688/6344 (Fax)
joel@liptonlaw.com
_____/

## COMPLAINT

COMES NOW Plaintiff by and through counsel and for his complaint against this Defendant, states as follows:

### PARTIES AND JURISDICTION

### INTRODUCTION

1. This is an action against the Defendant United States under the Federal Tort Claims Act, (28 U.S.C. Section 2671, *et seq.*) and 28 U.S.C. Section 1346(b)(1), for professional malpractice in connection with medical care provided to Plaintiff Allen J. Squire by the John D. Dingell Veterans Medical Center (hereinafter

JDVMC) staff agents and employees, including but not limited to Cynthia R. Piko, MD.

2. The claims herein are brought against the Defendant pursuant to the Federal Tort Claims Act (28 U.S.C. Section 2671 *et. Seq.)* and 28 U.S.C. Section 1346(b)(1), for money damages as compensation for personal injuries caused by the Defendants' negligence.

3. Plaintiff Allen Squire has fully complied with the provisions of 28 U.S.C. Section 2675 of the Federal of the Federal Tort Claims Act. *Standard Form 95 attached as Exhibit 1*.

4. This suit has been timely filed, in that Plaintiff Allen Squire timely served notice of his claim on the Department of Veterans Affairs, less than two years after the incident forming the basis of this suit.

5. Plaintiff Allen Squire is now filing this Complaint pursuant to 28 U.S.C. Section  2401(b), 2675(a) as more than six months have passed since the submission of the "form 95" and no settlement or resolution of the claim has been achieved. In addition, no "final denial of administrative claim" has been issued.

**PARTIES AND JURISDICTION**

6. Plaintiff Allen Squire at all times relevant was a resident of Detroit, Wayne County in the State of Michigan.

7. Defendant United States of America is liable for the errors, acts and omissions of the VAAAHS and its employees, including specifically Cynthia Pike, MD, pursuant to 42 USC 233 (g)-(h), 42 USC 233(A) and 28 USC 2679(b).

8. Cynthia Pike is a licensed physician, specializing in and at all relevant times, practicing in the field of Internal Medicine.

9. At all times relevant to this Complaint, JDVMC and Dr. Pike held themselves out to the Plaintiff and eligible beneficiaries, as providers of high-quality health care services with the expertise necessary to maintain the health and safety of patients like the Plaintiff.

10. At all times relevant to this action, Dr. Pike was acting in the course and scope of their employment with the JDVMC.

11. This Court has original subject matter jurisdiction based upon a Federal Question being raised under the constitution and laws of the United States, pursuant to 28 U.S. § 1331.

12. The events or omissions giving rise to the Plaintiff's claims happened in the Eastern District of Michigan. Accordingly, venue is proper in this district pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

13. Plaintiff incorporates all prior allegations as if fully set forth herein.

14. This case arises out of the failures of the named medical care providers to follow the standard of care by failing to timely and appropriately act upon abnormal laboratory results, specifically highly elevated prostate specific antigen (PSA), resulting in a delay in the diagnosis and treatment of prostate cancer.

15. Allen J. Squire is a U.S. Army veteran who served 1984-1991. After he was honorably discharged in 1991, Mr. Squire utilized health care services at the John D. Dingell Veterans Administration (VA) Medical Center.

16. On 10/09/13, Mr. Squire's PSA was evaluated as part of his health maintenance screening. The PSA level was 3.86 ng/ml. The PSA reference range noted by the VA was 0 to 4 ng/ml.

17. Throughout 2014 to 2018, Mr. Squire continued to treat at the VA for various chronic health conditions such as knee pain, low back pain, allergies, PTSD, hearing loss, and glaucoma.

18. On 5/28/19, Mr. Squire had a primary care physician outpatient visit with Internal Medicine physician Cynthia Piko, MD. Mr. Squire's chief complaints were headache, he wished to have a sexually transmitted infection (STI) check, and he was interested in smoking cessation.

19. His physical exam findings were unremarkable, and he reported no dysuria and no hematuria. No penile discharge/drainage was mentioned in the note. Dr. Piko noted that she would obtain "baseline blood work," as well as blood and urine tests for STIs. She advised Mr. Squire to return in 12 months or sooner if there were any concerns.

20. On 5/30/19, Mr. Squire's had a PSA level drawn and the result was elevated at 15.53 ng/ml.

21. On 5/31/19, Dr. Piko noted a telephone encounter with Mr. Squire: "Pt had been very nervous and anxious about his test results. I called him this am to discuss all the results that had returned at this point. He reports that he will cut down on his Acetaminophen, because his LFT are slightly elevated. I will call him again and send a letter when I receive additional test results."

22. On 6/03/19, Dr. Piko sent a Test Notification Note to Mr. Squire which outlined the lab results collected on 5/30/19. Dr. Piko wrote "I think your discharge is coming from your prostate. Your urinalysis was normal, but it is possible to get an infection in your prostate, and some of your prostate levels were high. I am going to send you a prescription for 2 weeks for your prostate and I would like you to finish the entire prescription." It is not noted what type of prescription was entered by Dr. Piko.

5

23. On 9/18/19, Mr. Squire had a primary care physician outpatient visit with Dr. Piko. The note mentions PSA of 3.86 in October 2014, as well as the PSA of 15.53 from 5/30/19. Dr. Piko noted that the blood and urine tests for STI were "all negative." Mr. Squire's physical exam findings were again unremarkable, and no digital rectal exam was noted.

24. Dr. Piko did not revisit Mr. Squire's elevated PSA or his response to the medications she'd prescribed, and no further evaluations were carried out to determine why his PSA was elevated.

25. On 6/17/20, Mr. Squire had a telephonic visit with Dr. Piko. In this note, Dr. Piko noted the PSA of 3.86 from October 2014. Mr. Squire reported no dysuria or hematuria. Dr. Piko did not note the PSA of 15.53 from 5/30/19.

26. On 3/16/23, Mr. Squire had a primary care physician outpatient visit with Dr. Piko. He denied dysuria or hematuria. Mr. Squire's physical exam findings were again unremarkable; no digital rectal exam was noted. Dr. Piko noted "needs updated basic labs." She asked Mr. Squire to return in 6 months.

27. On 3/22/23, Mr. Squire's PSA level was significantly elevated at 70.01 ng/ml.

28. **Dr. Piko did not follow up on the PSA test that she ordered, nor did she inform Mr. Squire of the abnormal result of 70.01.**

6

29. On 10/26/23 at 06:50, Mr. Squire had a primary care physician outpatient visit with Dr. Piko. He denied dysuria or hematuria. Mr. Squire's physical exam findings were again unremarkable; no digital rectal exam was noted. Dr. Piko noted that Mr. Squire had an elevated PSA (presumably the PSA of 70.01 resulted seven months prior on 3/22/23) and she would recheck labs. She asked Mr. Squire to return in 6 months.

30. On 10/26/23 at 09:52, **Mr. Squire's PSA was severely elevated at 108.90 ng/ml.**

31. On 10/26/23 at 16:13, Dr. Piko entered an interim progress note: "His PSA is quite high, and I have consulted Urology."

32. On 11/28/23 at 11:16, Sharon Ellis, PACT Care Manager, entered a PACT Nurse Clinic Note that states "he is waiting for an appointment for Prostate Cancer. 10/26/23: Urology consult entered but discontinued and request bone scan. Forwarding this note to provider, also sent via TEAMS messaging." Dr. Piko acknowledged this note on 11/28/23 at 11:21.

33. On 12/12/23, Sharon Ellis, PACT Care Manager, entered a PACT Nurse Clinic Note addendum that states "Veteran presented as a walk in, inquiring about next steps to Urology Consult. Explained to veteran that bone scan needed to schedule before Urology consult will be accepted. Stated he attempted to schedule

7

and was unsuccessful. Writer called nuclear medicine; bone scan scheduled for 12/27/23 at 10 am."

34. On 12/27/23, Mr. Squire underwent a 3-phase whole body bone scan, ordered by Dr. Piko. The reason for study: "possible prostate cancer looking for mets." The radiologist's impression was "Focal uptake appreciated fusing to callus formation in the right ribs, likely secondary to trauma and previous fracture. Clinical correlation is advised and attention at follow-up is recommended."

35. On 1/09/24, Dr. Piko sent a Test Notification Note to Mr. Squire which outlined the bone scan results. The letter states "TEST WITHIN NORMAL RANGE. Comments: Everything looks pretty normal."

36. On 1/18/24, Jemica Carter, FNP of the Urology Service at the John D. Dingell VA Medical Center entered a Urology Telephone Consult Response note. Ms. Carter noted Mr. Squire's elevated PSA of 108.90 from 10/26/23. She noted "Patient has a history of elevated PSA and urology consult entered on 1/9/24. He is new to the urology service. Most recent PSA is 108.90 on 10/26/23, 70.01 on 3/22/23, 15.53 on 5/30/19. Patient denies completion of a MRI prostate or prostate biopsy, or family history of prostate cancer."

37. Ms. Carter discussed with Mr. Squire the diagnosis, possible etiologies, including benign versus cancerous statistics (increased risk of prostate cancer) for elevated PSA levels and plan of care including review of bone scan results,

8

implications of current and previous PSA lab results documented above, and recommendations to complete an MRI prostate and prostate biopsy. An MRI of the prostate was ordered.

38. On 2/08/24, Mr. Squire underwent an MRI of the prostate with and without contrast. The impression was "Overall PI-RADS assessment category: PI-RADS 5. Bilateral infiltrative lesions with evidence suggesting EPE and with suspicious lymph nodes." According to the radiology report, PI-RADS 5 denotes "Very high (clinically significant cancer is highly likely to be present)."

39. On 3/14/24, Mr. Squire underwent a CT Urogram. The impression was as follows: "1. Focally increased radiopharmaceutical uptake identified in the prostate corresponding to previously described lesions on MRI. 2. No increased PSMA [prostate-specific membrane antigen] seen fusing to previously described, morphologically stable lymph nodes in the left common iliac and left internal iliac regions. 3. No frank scan evidence to suggest PSMA avid local regional or distant metastatic disease."

40. On 3/18/24, Mr. Squire underwent a flexible cystoscopy and transrectal ultrasound-guided prostate biopsy. The cystoscopy showed the anterior urethra meatus within normal limits, normal caliber, no strictures, and external urethral sphincter within normal limits. The posterior urethra showed bilateral prostatic lobar

9

hypertrophy, length from verumontanum till proximal urethra 3cm. The bladder showed no suspicious lesions or exophytic masses, no trabeculations, no stones.

41. On 4/03/24, Mr. Squire was evaluated by Alaa Hamada, MD of the Urology Service at the John D. Dingell VA Medical Center. Dr. Hamada reviewed the prostate biopsy results with Mr. Squires, which included the following:

A. Prostate, right apex, core biopsy: Prostatic adenocarcinoma, Gleason score 7 (3+4), grade group 2, involving one of two cores and 10-20% of tissue submitted.
B. Prostate, right mid, core biopsy: Prostatic adenocarcinoma, Gleason score 7 (3+4), grade group 2, involving one of two cores and 10-20% of tissue submitted.
C. Prostate, right base, core biopsy: Prostatic adenocarcinoma, Gleason score 7 (4+3), grade group 3, involving two cores and 80-90% of tissue submitted.
D. Prostate, left apex, core biopsy: Prostatic adenocarcinoma, Gleason score 8 (4+4), grade group 4, involving two cores and 70% of tissue submitted. Perineural invasion and cribriform glands are present.
E. Prostate, left mid, core biopsy: Prostatic adenocarcinoma, Gleason score 8 (4+4), grade group 4, involving two cores and 70% of tissue submitted.
F. Prostate, left base, core biopsy: Prostatic adenocarcinoma, Gleason score 9 (4+5), grade group 5, involving two cores and 80-90% of tissue submitted.
G. Prostate, ROI-1, core biopsy: Prostatic adenocarcinoma, Gleason score 8 (4+4), grade group 4, involving one core and 60% of tissue submitted.
H. Prostate, ROI-2, core biopsy: Prostatic adenocarcinoma, Gleason score 8 (4+4), grade group 4, involving one core and 80-90% of tissue submitted.

42. Dr. Hamada noted that Mr. Squire's prostate cancer was staged as T3bN1, Gleason grade group (gg) 5. Dr. Hamada explained treatment options

included surgery using open or robotic assisted lap prostatectomy or radiation using brachytherapy or EBRT. Dr. Hamada explained that given the lymph node involvement, radiation may be more appropriate than surgery. Dr. Hamada recommended a PET scan and referrals to radiation oncology and medical oncology.

43. On 4/05/24, the Tumor Board at the JDVMC reviewed Mr. Squire's case. Services that partook in the meeting included Medical Oncology, Radiology, Pathology, Gastroenterology, Surgery, Radiation Oncology, Urology, Pulmonary, Social Work, Palliative Care, and Interventional Radiology.

44. The board noted Mr. Squire's clinical and/or pathologic stage as "Very high risk, cT3aN1Mx stage IVA." The plan was to obtain PSMA/PET/MRI, medical oncology consult scheduled for 5/6/24, and radiation oncology consults. Combined therapy would be discussed.

45. On 4/25/24, Mr. Squire had a primary care physician outpatient visit with Dr. Piko. Dr. Piko noted that Mr. Squire had prostate cancer and was seeing Urology, that he had a PET scan scheduled, and that he would be seeing Radiation oncology, Oncology, and Urology afterwards. Mr. Squire's physical exam was unremarkable. Mr. Squire reported he was having worsened nocturia and would like to be started on medication for that. Dr. Piko noted that she would defer to Urology. Dr. Piko asked him to return in 6 months.

46. On 5/14/24, Mr. Squire underwent a PET scan from his skull base to mid-thigh. The results were as follows: "1. Focally increased radiopharmaceutical uptake identified in the prostate corresponding to previously described lesions on MRI. 2. No increased PSMA seen fusing to previously described, morphologically stable, lymph nodes in the left common iliac and left internal iliac regions. 3. No frank scan evidence to suggest PSMA avid local regional or distant metastatic disease."

47. On 5/16/24, Mr. Squire was evaluated by Radiation Oncology. The diagnosis of very high risk prostate adenocarcinoma was discussed, as well as the appropriate treatment options. Radiation Oncology follow up for CT simulation was scheduled for 7/25/2024.

48. On 5/16/24, Mr. Squire had a repeat PSA level, which remained elevated at 95.76.

49. On 6/17/24, Mr. Squire was evaluated by oncologist Scott Dawsey, MD. Dr. Dawsey noted that Mr. Squire had had rising PSA since 2019, with most recent PSA 108.9. He recommended that Mr. Squire continue with hormone therapy Abiraterone with Prednisone, along with Eligard and Calcium and Vitamin D supplements. <u>Dr. Dawsey noted that Palliative Medicine was consulted</u>.

12

50. Mr. Squire continues to treat for his advanced stage IV metastatic prostate cancer, a diagnosis that carries an average 5-year survival rate of 28%[1].

51. Had Dr. Piko exercised ordinary care, Mr. Squire's prostate cancer would have been diagnosed on a timely basis, his treatment would have been ordinary and he would not suffer from a radically reduced life expectancy.

52. As a direct and proximate result of the Defendants' failure to treat and then delay in treatment precipitated by Dr. Piko and the JDVMC, Mr. Squire has and continues to suffer from pain, fright, shock, humiliation, mortification, disability and emotional distress. He has incurred and will continue to incur medical and other expenses and has sustained a loss of earning capacity.

## CAUSE OF ACTION FOR MEDICAL MALPRACTICE

53. Plaintiff incorporates all prior allegations as if fully set forth herein.

54. The Defendant USA, as the real party in interest for JDVMC and Dr. Piko, and any other employees who were, or should have been involved in providing appropriate care for Mr. Squire, had a duty to provide ordinary care, and to exercise that standard and degree of care and skill required of health care providers, consistent with the expertise that the Defendant presented to the community at large.

---

[1] https://www.hopkinsmedicine.org/health/conditions-and-diseases/prostate-cancer/prostate-cancer-prognosis

55. The standard of care required JDVMC through its agents, employees and staff and in particular through Dr. Piko as a reasonable and prudent internal medicine physician, when presented with a patient exhibiting signs and symptoms such as those demonstrated by Plaintiff Allen Squire, is to:

   a. Exercise that degree of reasonable clinical judgment and provide appropriate care that a reasonable Internal Medicine physician would under the same or similar circumstances;
   b. Recognize that the likelihood of prostate cancer increases with more elevated PSA values;
   c. Recognize and act upon age-specific reference ranges for PSA values;
   d. Recognize that when detected in the early stages, prostate cancer has a much better prognosis that if it is detected in the late/advanced stage;
   e. Timely repeat PSA testing to confirm that the PSA level remains elevated after the patient has completed treatment for suspected infection or after ruling out some other cause of elevated PSA (e.g. BPH, trauma), and then immediately refer the patient for urologic consultation/evaluation;
   f. Refrain from withholding critically abnormal laboratory results from a patient, specifically, severely elevated PSA values;
   g. Timely follow up on and report severely elevated PSA levels to the patient and other health team members;
   h. Advocate for a patient who is not knowledgeable about the applicable standards of care for the detection of prostate cancer;
   i. Ensure there is no delay in referring a patient for an immediate urologic consultation/evaluation when there is a heightened clinical concern for advanced stage prostate cancer;
   j. Other standards as shall be revealed in discovery.

56. As a direct and proximate result of the violations of the standards of care referenced above, Defendant, by and thru JDVMC and Dr. Piko, among other

employees, failed to timely treat Mr. Squire and failed to timely refer him for definitive testing and treatment, resulting in the injuries previously alleged.

WHEREFORE Plaintiff requests the following relief;

A. Compensatory non-economic and economic damages including but not limited to all damages recoverable under the laws of the United States, and of the State of Michigan;

B. Reasonable attorney fees, costs and interest;

C. Such other and further relief as appears reasonable and just under the circumstances.

Respectfully submitted,

LIPTON LAW

/s/ Joel A. Sanfield

JOEL A. SANFIELD (P42968)
Attorneys for Plaintiff
18930 W. Ten Mile Rd.
Southfield, MI  48075
(248) 557-1688/fx 248-557-6344
joel@liptonlaw.com

Dated:       August 20, 2025